T.C. Memo. 2003-43


UNITED STATES TAX COURT


JOHN G. GOETTEE, JR. AND MARIAN GOETTEE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 26591-96.          Filed February 25, 2003.

        Ps claimed investment credits and losses arising
out of a partnership in which they held a limited
interest.  By notice of deficiency, R disallowed these
claimed credits and losses.  R extended a uniform
settlement offer to all taxpayers, including Ps,
involved in similar partnerships.  Ps promptly
communicated to R their acceptance of the offer, but R
did not send to Ps a proposed decision document for
about 11 months.  When Ps received this document, they
promptly executed and returned it to R, but R did not
sign it for about 5 months.  After entry of decision, R
assessed (1) the deficiencies and additions as
determined in the decision document, plus interest
thereon, and (2) accrued, but unassessed interest on
previously assessed deficiencies.  Ps paid the
deficiencies and additions, and requested an abatement
of interest.  R initially disallowed Ps abatement
request in full; Ps appealed.  On appeal, R issued a
notice of determination allowing a partial abatement.
Ps then paid the remaining assessed interest
liabilities.

1.  <u>Held</u>:  R's failure to abate interest for any disputed period through Jan. 24, 1995, and any disputed period from Apr. 25, 1995, onward was not an abuse of discretion, because the delays that Ps identify are not attributable to R's error or delay in performing a ministerial act.  R's failure to abate interest for the period Jan. 25 through Apr. 24, 1995, was an abuse of discretion because it was attributable to an unjustified delay in R's official performing a ministerial act.  Sec. 6404(e), I.R.C. 1986.

2.  <u>Held</u>, <u>further</u>, R has conceded errors in computing amounts of interest; in the exercise of our overpayment jurisdiction R is sustained as to each of the disputed unconceded items.  See sec. 6404(h)(2)(B), I.R.C. 1986.

During the course of Ps' efforts to persuade R to abate the interest, in response to R's agent's suggestion, Ps made an offer in compromise of $40,000 to settle about $120,000 of interest on 4 years of income tax liabilities.  Later, again at R's agent's suggestion, Ps withdrew their offer in compromise.  A few months later, R returned Ps' $40,000 without interest.

3.  <u>Held</u>, <u>further</u>, on this record we shall not direct R to abate any interest, nor shall we require recomputation of interest on account of the $40,000.

<u>Matthew J. McCann</u>, for petitioners.

<u>Elizabeth S. Henn</u> and <u>William J. Gregg</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

CHABOT, <u>Judge</u>:  Respondent issued a notice of determination partially disallowing petitioners' claim to abate interest with respect to underpayments for 1978, 1979, 1981, 1982, and 1983.

Petitioners petitioned the Court under section 6404[1] to review this abatement disallowance as to all 5 years. We granted respondent's motion for partial summary judgment that respondent does not have authority to abate interest as to 1978. <u>Goettee v. Commissioner</u>, T.C. Memo. 1997-454. Petitioners have conceded as to 1983. As a result, only 1979, 1981, and 1982 remain before the Court in the instant case.

---

[1] The petition refers to sec. 6406, but it is evident that sec. 6404 is the intended authority.

Unless otherwise indicated, all section, subchapter, chapter, and subtitle references are to sections, subchapters, chapters, and subtitles of the Internal Revenue Code of 1954 for the underpayment years in issue. References to sec. 6404 are to that section of the Internal Revenue Code of 1986 as in effect for proceedings commenced at the time the petition in the instant case was filed.

After concessions by both sides,[2] there are two categories of issues for decision, as follows:

(1)  Whether respondent's failure to abate interest for certain time periods constitutes an abuse of discretion.

(2)  Whether respondent's interest computations are correct.

## FINDINGS OF FACT

Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference.

When the petition was filed in the instant case, petitioners, John G. Goettee, Jr. (hereinafter sometimes referred to as John), and Marian Goettee (hereinafter sometimes referred

_____

[2]  As noted supra, petitioners concede as to interest on underpayments for 1983.

Respondent concedes that respondent underabated the amount of interest for the period Oct. 4, 1995, through Sept. 20, 1996.

The parties agree that there remain overassessments for 1981 and 1982.  Respondent contends that insufficient interest was assessed as to underpayments for 1979, but concedes that no additional amounts of interest are to be assessed against petitioners.

Other concessions are discussed infra in connection with the issues to which the specific concessions relate.

Respondent concedes that a Rule 155 computation will be necessary.

Unless indicated otherwise, all Rule References are to the Tax Court Rules of Practice and Procedure.

to as Marian), husband and wife, resided in New Windsor, Maryland; their collective net worth did not exceed $2 million.

At all relevant times, John was self-employed as a dentist, and Marian was employed as the office administrator for John's dental practice. Marian is also a licensed and certified speech and language pathologist.

Petitioners filed joint Federal income tax returns for 1979, 1981, and 1982. They made their tax returns on the basis of the calendar year. Petitioners paid the entire amount of the tax liabilities shown on each of their tax returns for 1979, 1981, and 1982 before the respective tax return was required to be filed. In particular, petitioners' 1979 tax return was filed on or before April 15, 1980, and the $19,821.50 liability shown thereon was paid in full by a combination of withheld taxes ($1,135.20), estimated tax payments ($18,000), and payment with the tax return ($686.30). Petitioners' 1981 tax return was filed on or before April 15, 1982, and the $6,277 liability shown thereon was paid in full by a combination of withheld taxes ($1,135.20), estimated tax payments ($11,500), and other refundable credits ($1,095). On June 7, 1982, respondent refunded the $7,453.20 overpayment claimed on the 1981 tax return. Respondent did not pay interest on this refund for 1981. Petitioners' 1982 tax return was filed on or before April 15, 1983, and the $4,919 liability shown thereon was paid in full by

a combination of withheld taxes ($1,868), estimated tax payments ($17,000), and other refundable credits ($500). On June 13, 1983, respondent refunded to petitioners $14,851.79, consisting of $14,549 plus interest thereon (for the period Apr. 15 through June 1, 1983) in the amount of $302.79 for 1982.

A. The Transaction

On the recommendation of John's father, an accountant and tax attorney, John[3] acquired a limited partnership interest in The Thompson Equipment Associates partnership (hereinafter sometimes referred to as TEA) during September 1981. John acquired the interest in TEA in exchange for a $12,500 check and a $12,500 promissory note which matured on February 15, 1982. Marian issued a check on February 10, 1982, that paid the promissory note in full.

Petitioners claimed flowthrough losses from TEA on their tax returns for 1981, 1982, and 1983. Petitioners carried back "credits/losses" from 1981 to 1978 and 1979. As a result of the "credits/losses" carried back from 1981 to 1979, on June 28, 1982, respondent refunded to petitioners $10,375.38, consisting of $9,568 plus interest thereon (for the period Jan. 1 through

---

[3] The parties have stipulated that (1) John acquired the partnership interest, and (2) both petitioners were limited partners. The parties have not reconciled the two stipulations. It does not appear to matter to the instant case whether Marian also was a limited partner in Thompson Equipment Associates. For convenience, we refer to John as the limited partner.

June 16, 1982) in the amount of $807.38. Respondent did not credit petitioners' 1979 account with interest for the period June 16 through June 28, 1982. On June 13, 1983, when respondent refunded to petitioners the overpayment petitioners claimed on their 1982 tax return, respondent did not credit petitioners' 1982 account with interest for the period June 1 through June 13, 1983.

B. The Tax Court Proceeding and Surrounding Circumstances

On October 15, 1986, respondent sent to petitioners a notice of deficiency, in which respondent made adjustments on account of TEA items and determined deficiencies and additions to tax as shown in table 1.

Table 1

| | | Additions to Tax | | |
| Year | Deficiency | Sec. 6653(a)(1) | Sec. 6653(a)(2) | Sec. 6659 |
|------|-----------|-----------------|-----------------|-----------|
| 1978 | $14,607 | $730 | -- | $4,382 |
| 1979 | 8,208 | 410 | -- | 2,462 |
| 1981 | 9,537 | 477 | [1] | 2,861 |
| 1982 | 8,129 | 406 | [2] | 2,439 |

[1] 50 percent of the interest due on $9,537.

[2] 50 percent of the interest due on $8,129.

Respondent also determined that petitioners' deficiencies are subject to an increased rate of interest under section

6621(c) (hereinafter sometimes referred to as the section 6621(c) rate).[4]

On November 3, 1986, petitioners filed a petition with this Court seeking a redetermination of their tax liabilities for 1978, 1979, 1981, and 1982.  John R. Shematz (hereinafter sometimes referred to as Shematz), who was in business with John's father, signed the petition and initially represented petitioners in this Court.

Petitioners' case was assigned to a group of cases collectively referred to as the Barrister Books project (hereinafter sometimes referred to as Barrister).  The Barrister partnerships started to be formed in 1981.  Andrew M. Winkler (hereinafter sometimes referred to as Winkler) served as lead counsel for the Commissioner in the Barrister cases.  Sometime around 1986, the Commissioner extended a uniform settlement offer to any Barrister investor.  The Commissioner withdrew the offer on or about May 16, 1989.

---

[4]  The notice of deficiency refers to sec. 6621(d).  Sec. 6621(d) was redesignated as sec. 6621(c) by sec. 1511(c)(1)((A) of the Tax Reform Act of 1986 (TRA 1986), Pub. L. 99-514, 100 Stat. 2085, 2744.  We shall refer to this section as sec. 6621(c).

Secs. 6653(a), 6659, and 6621(c) were repealed by sec. 7721 of the Omnibus Budget Reconciliation Act of 1989 (OBRA 1989), Pub. L. 101-239, 103 Stat. 2106, 2399, for tax returns due after Dec. 31, 1989.  The substance of former secs. 6653(a) and 6659 now appears in sec. 6662.  These repeals and revisions do not affect petitioners' liabilities for the years involved in the notice of deficiency on which table 1 is based.

Another tax case project, the Bromwell Book project (hereinafter sometimes referred to as Bromwell), was active at the same time as Barrister. The Bromwell partnerships started to be formed in 1978 or 1979. Winkler served as the Commissioner's lead counsel for Bromwell; he considered Bromwell to be a predecessor of Barrister.

For the years before the enactment of the so-called "partnership litigation" provisions in the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA 1982), Pub. L. 97-248, 96 Stat. 324,[5] efforts were made to (1) group related partnership cases, (2) designate one or more cases in a group as "lead cases", and (3) try to have the parties in other cases in the related partnership group agree to be bound by the outcome of the lead cases. On January 2, 1986, Special Trial Judge Pate issued a Memorandum Sur Order which, the parties have stipulated, established Leger v. Commissioner, docket No. 18640-84, as "a test case with regard to all of the Bromwell Book cases."

---

[5] Sec. 402 of TEFRA 1982 provides for the unified audit and litigation procedures of subch. C of ch. 63 (secs. 6221 et seq.) (the "TEFRA provisions"). Under the TEFRA provisions, if the dispute arises from a "partnership item" (as defined by sec. 6231(a)(3)), then the dispute is resolved at the partnership level. Sec. 6221; see Maxwell v. Commissioner, 87 T.C. 783, 787-788 (1986) (explaining the effect of the TEFRA provisions). The TEFRA provisions generally apply to partnership taxable years beginning after Sept. 3, 1982. TEFRA 1982 sec. 407, 96 Stat. at 670.

On September 22, 1986, Shematz notified petitioners that respondent intended to seek continuances in the Bromwell cases pending resolution of Leger v. Commissioner, supra, and that the decision in Leger v. Commissioner, supra, was likely to be appealed and would thus delay the outcome of their case for several years.

On March 18, 1987, we filed our opinion in Leger v. Commissioner, T.C. Memo. 1987-146, affd. without published opinion 860 F.2d 435 (5th Cir. 1988), wherein we sustained the Commissioner's determinations that the taxpayers were not entitled to claim their distributive share of the partnership investment credit and losses, because the partnership was not engaged in for-profit activities under section 183.

On May 15, 1987, petitioners' case was assigned to Special Trial Judge Pate for trial or other disposition.

On March 20, 1989, Special Trial Judge Pate invited Winkler and the Barrister cases taxpayers or their counsel (including petitioners' case) to a pretrial conference scheduled for June 16, 1989, in order to consider and decide a number of procedural matters, including "The choice of lead cases (a maximum of four)".

Winkler determined that, if the Tax Court was going to try a Barrister case, then the Commissioner and the taxpayers should follow the Tax Court's opinion, rather than the Commissioner's

settlement package.  As a result, the uniform settlement package was withdrawn a month before the scheduled pretrial conference.

At the June 16, 1989, pretrial conference, representatives of the promoters for the Barrister partnerships suggested that it would be better to have a promoter-funded TEFRA partnership case as a lead Barrister case.  Special Trial Judge Pate agreed with that approach.  That pretrial conference did not result in the selection of a Barrister lead case.

During September 1989, Barrister Equipment Assocs. Series #115 v. Commissioner, docket No. 23263-89 (hereinafter sometimes referred to as Series 115) was selected as the lead case for Barrister.  Series 115 involved 1983 and 1984; it was a TEFRA partnership case.

In late 1989, the Court was informally advised that Shematz had died.  Thereafter, petitioners proceeded pro se.

On October 20, 1989, a motion was filed in Series 115 to reassign that case from Special Trial Judge Pate to a Presidentially appointed Judge of this Court.  The motion was based on contentions that assignment of that case to a Special Trial Judge was not authorized by statute and that it violated the United States Constitution.  The motion also requested that, if the Court denied the motion, then the Court should stay the case and certify the issue for interlocutory appellate review pursuant to section 7482(a)(2).

On April 9, 1990, we filed our unanimous Court-reviewed opinion in First Western Govt. Securities v. Commissioner, 94 T.C. 549 (1990), in which we denied an identical motion filed by the taxpayers in those consolidated cases. We certified those cases for interlocutory appellate review. Id. at 564-565, 569. We held those cases, and others such as Series 115, in abeyance pending appellate resolution of the issue. Our opinion in First Western Govt. Securities v. Commissioner, supra, was affirmed sub nom. Samuels, Kramer & Co. v. Commissioner, 930 F.2d 975 (2d Cir. 1991). The issue finally was resolved in Freytag v. Commissioner, 501 U.S. 868 (1991).

On July 15, 1991, Series 115 was assigned to Special Trial Judge Pate. Series 115 was tried and submitted to Special Trial Judge Pate on January 15, 1993.

In the spring of 1993, after the trial in Series 115, the Commissioner renewed the earlier settlement offer in the Barrister cases. Winkler decided to renew the settlement offer because he anticipated many problems in the pre-TEFRA Barrister cases which would require a lot of time to resolve. Some of the problems Winkler anticipated included the presence of carrybacks and mispostings to accounts. The settlement offer also was renewed to (1) give Winkler and his colleagues work while they were awaiting an opinion in the Series 115 case, and (2) reduce the inventory of Barrister cases.

The task of processing the settlement of the Barrister cases fell to Winkler and an Appeals officer in respondent's Louisville, Kentucky, office, hereinafter sometimes referred to as the Louisville office. Elmer Craig (hereinafter sometimes referred to as Craig) succeeded Charles Bower as the Appeals officer who shared with Winkler the responsibility of processing the Barrister cases.

The settlement offer was communicated to investors in Barrister partnerships by letter (hereinafter sometimes referred to as settlement letters). The settlement offer was intended to be made available to every investor in a Barrister partnership. However, Winkler decided to send only a few settlement letters at any given time because he thought that he and Craig (the only ones working on the settlements at this point) would not have been able to process the settlement offer in a timely manner if it was made simultaneously available to every investor in a Barrister partnership. Also, the death and relocation of some of the Barrister taxpayers or their representatives made it difficult for Winkler to communicate the settlement offer to some of the Barrister taxpayers.

Winkler and Craig generally processed the Barrister cases in taxpayer alphabetical sequence. They deviated from this system if, for example, the person who represented a Barrister taxpayer whose surname began with the letter A also represented other

Barrister taxpayers whose surnames began with letters other than A.  In these circumstances, Winkler and Craig processed all of the cases with common representation at the same time.  Another category of deviations from strict alphabetical sequence involved taxpayers or their representatives who telephoned Winkler or Craig, described their circumstances, and indicated their agreement with the proposed settlement.  Petitioners' case did not fall into either of the foregoing categories of cases in which respondent deviated from strict alphabetical sequence.

In the spring of 1993, the Commissioner's Appeals Office in Cincinnati, Ohio (hereinafter sometimes referred to as the Cincinnati office), learned of the Barrister case settlements that Winkler and Craig were processing.  At that time, Appeals officers in the Cincinnati office had caseloads of about 50-60 cases, which was about half of their normal caseloads.  The chief of the Cincinnati office, the associate chief (Paul R. Becker, hereinafter sometimes referred to as Becker), and Appeals Officer Fran Rowland (hereinafter sometimes referred to as Rowland) went to the Louisville office to discuss with Winkler and Craig the possibility of the Cincinnati office processing some of the Barrister case settlements.  By the end of the meeting, it was decided that the Cincinnati office would take some 200 of the pre-TEFRA Barrister cases.  Winkler remained responsible for executing Tax Court decision documents on behalf of the

Commissioner in Barrister cases.  The Louisville office retained some of the pre-TEFRA Barrister cases which involved multiple tax shelters.  The Cincinnati office picked up the cases from the Louisville office in June of 1993.

The number of cases transferred to the Cincinnati office, coupled with their complexity, created the need for Craig to conduct an all-day training session about how to process the settlement of these cases.  Employees in the Cincinnati office who were to process the Barrister cases traveled to the Louisville office to attend this session.  The need for a training session to become able to settle a case was not typical.

About July of 1993, the Barrister cases were assigned to Rowland and two other Appeals officers.  About 75 cases were assigned to Rowland, about 75 to another Appeals officer, and about 50 to the remaining Appeals officer.  Petitioners' case was among those assigned to Rowland.

Appeals officers in the Cincinnati office managed multiple priorities while they processed the settlement of the Barrister cases.  Cases nearing the end of the limitations period, and Tax Court cases calendared for trial in Cincinnati and Columbus, Ohio, were given a higher priority than the Barrister cases. Rowland typically did all of the service center claim cases-- these, too, were given a higher priority than the Barrister cases.

C.  The Settlement Process - Generally

Although Rowland's caseload was about half of her normal caseload in the spring of 1993, her caseload had returned to normal, about 100-120 cases, about the same time the Barrister cases were assigned to her.  Because of the increase in her workload, Rowland did not send any settlement letters to any Barrister taxpayers until about September of 1993.

Rowland sent settlement letters in groups of 10 to 15.  The settlement letters (1) stated the terms of the settlement offer, (2) asked the recipients to submit to Rowland copies of their canceled checks (hereinafter sometimes referred to as verification information) within 10 days so that she could verify the recipients' actual cash investment in the partnership, and (3) stated that upon receipt of the verification information, Rowland would send to the Barrister taxpayer computations which showed the tax effects of the settlement offer to that taxpayer.

The settlement letters generated a significant and generally prompt response from many of the Barrister taxpayers.  More than half of the Barrister taxpayers who responded to the settlement offer submitted their verification information within the requested 10 days.  Rowland also received numerous phone calls regarding the settlement offer, many of which concerned the amount of interest that would be assessed.

The Cincinnati office usually processed the Barrister case responses on a first in, first out basis. Consistent with this policy, Barrister taxpayers who responded after the 10-day period were still permitted to avail themselves of the settlement offer, but their cases were processed after the cases for which verification information had already been provided.

After receiving the verification information in a case, Rowland's first step was to compare that information to the amounts claimed on that taxpayer's tax return. The second step was to determine whether that taxpayer was involved in any other tax shelter activities for the relevant pre-TEFRA years and, if so, then whether adjustments had been made regarding those other tax shelter activities. Many Barrister taxpayers were also involved in other tax shelters. If the taxpayer was involved in other tax shelters, then Rowland usually had to make phone calls to other Internal Revenue Service Centers to find out the status of the Commissioner's actions regarding those other tax shelters.

The third step in the settlement process required Rowland to input the taxpayer's information into a computer which would enable her to (1) generate a Form 5278 (Statement of Income Tax Changes), (2) complete the requisite number of Form(s) 3623 (Statements of Account), and (3) draft the proposed decision document, hereinafter collectively referred to as the settlement documents. Rowland had to personally prepare the tax deficiency

computations for each affected year, including in most cases carryback years. The settlement documents showed not only the deficiency amounts, but also the balances due. However, the settlement documents did not show the amount of interest due. Rowland then sent the settlement documents to the taxpayer. The taxpayer was instructed that, if the taxpayer approved, then the taxpayer was instructed to sign the proposed decision document and return it to Rowland within 30 days.

Many people called to find out the amount of interest they would have to pay. Rowland and the other Appeals officers typically told those people that a "ballpark figure" would be three or four times the deficiency due. If the people wanted more precise information, then Rowland and the other Appeals officers had a support office prepare computations, which then were forwarded to those who inquired. Generally, the people who inquired about interest did not return the decision document until they received the requested information.

For about the first 6 months that the Cincinnati office processed Barrister cases, Rowland and the other Appeals officers sent the proposed decision documents to Winkler and Craig for their approval before sending them to the Barrister taxpayers. The Cincinnati and Louisville offices were in frequent contact about drafts of the proposed decision documents during this time because many of the proposed decision documents were incorrect in

some respect.  Once the Cincinnati office became more proficient at drafting the proposed decision documents, proposed decision documents were sent to Barrister taxpayers without first obtaining the approval of either Winkler or Craig.

Normally, an Appeals officer in the Cincinnati office working on a Barrister case required about 26 calendar days to (1) verify the amount of the taxpayer's cash investment, (2) determine whether the taxpayer was involved in another tax shelter, (3) input the taxpayer's information into the computer, (4) prepare the settlement documents, and (5) mail the settlement documents to the taxpayer.

If a taxpayer accepted the settlement offer and returned the signed decision document, then Rowland prepared and submitted to Becker an appeals transmittal and case memorandum for his approval.  If Becker approved, then he signed the appeals transmittal and case memorandum and transmitted the settlement documents to Winkler.  Winkler then reviewed the format and contents of the decision documents, signed them, and forwarded them to the Court for entry of decision.  It ordinarily took Winkler less than 1 hour to review and sign an average decision document that did not have any problems.  However, Winkler gave priority to working on cases calendared for trial by the Court.

D.  The Settlement Process - Petitioners' Case

On November 24, 1993, Rowland sent to petitioners the following settlement letter.

Dear Mr. and Mrs. Goettee:

This case has been referred to us by District Counsel in Louisville, Kentucky, to offer you a settlement in your tax shelter dispute concerning Thompson Equipment Associates. Please consider this settlement in view of the Tax Court decisions in Thomas J. Leger, T.C. Memo. 1987-146, Harris Cashman, T.C. Memo. 1989-533, and Marvin Chupack, T.C. Memo. 1989-548.

The terms in offer of settlement are:

1. 50% of cash investment is allowed as a loss in 1981;
2. no investment tax credit (ITC) is allowed;
3. no other loss, deduction, or credit will be allowed;
4. no negligence penalty under Section 6653(a) will be applied;
5. the overvaluation penalty, Section 6659, will be 20% of the ITC used;
6. no understatement penalty under Section 6661 will apply;
7. tax motivated interest under Section 6621(c) will apply to the entire deficiency.

There is no documentation in the file which substantiates your actual cash investment in this tax shelter. Please forward copies of your cancelled checks verifying your cash investment, within the next ten days. After this verification is received, you will receive the computations of the settlement offer, showing the tax effects if you accept the offer.

Please contact me if you have any questions or concerns. A return envelope is provided for your convenience.

This was the first time petitioners received a settlement offer from the Internal Revenue Service.

On December 2, 1993, John's father, who was petitioners' then representative,[6] sent petitioners' verification information to Rowland. At some point, Rowland examined petitioners' verification information and concluded that the amounts therein matched the amounts claimed on petitioners' relevant tax returns.

At some time between October 1 and October 15, 1994, Rowland determined whether petitioners were involved in a tax shelter other than TEA, and concluded that she did not need any further information from petitioners to compute their tax liability.

At some time between October 15 and October 21, 1994, Rowland entered petitioners' information into her computer. Rowland printed petitioners' Form 5278 on October 21, 1994. On October 26, 1994, Rowland mailed the settlement documents (together with a Form 3610 (Audit Statement)) to petitioners. Petitioners signed the decision document on November 25, 1994, and mailed it to Rowland on December 14, 1994. Petitioners enclosed the following letter to Rowland with their signed decision document:

---

[6] The parties have stipulated that John's father was petitioners' "representative" at the time of this letter. The parties also have stipulated that petitioners "proceeded pro se" in this Court after Shematz's death, in 1989. We gather from this that John's father represented petitioners before the Internal Revenue Service, but not before this Court.

Dear Ms. Rowland:

We have attempted, without success, to reach you by telephone.  We have signed the enclosed papers concerning the settlement of the case with Barrister Books, but are very confused about the figures that are on the enclosed statements.  When we made the original investment, everything was legal, had been checked by the IRS and attorneys and was approved as a valid investment.  Now, the tables have really turned!  The last correspondence that we had from you was in November, 1993, and it has taken a year to respond to us.  At that time we had forwarded to you copies of checks, etc. that proved when we entered this partnership.  Why has it taken so long?  Also, why has it taken nearly 14 years to bring this case to this point?  It hardly seems fair to us that we should be penalized for something that was legal in the first place, and then, 14 years later, becomes a tax problem and we are the ones that bear the brunt of it.

We would appreciate any answers that you could give us.

On December 23, 1994, Rowland prepared, signed, and sent to Becker an appeals transmittal and case memorandum which outlined the terms of the settlement of petitioners' case.

On January 13, 1995, Becker signed and approved the appeals transmittal and case memorandum.  That same day, Becker wrote to petitioners as follows:

Dear Mr. & Mrs. Goettee:

The proposed settlement you reached with the Appeals Officer, as reflected in the stipulation-decision document, has been approved.  We have forwarded the stipulation you signed to District Counsel for filing with the United States Tax Court.

The Tax Court will notify you of entry of the stipulation. If there is any amount due as a result of this settlement, you will be billed by the service center.

Becker then delivered petitioners' proposed decision document to the records office of the Cincinnati office, which had 5 days to send the proposed decision document to Winkler.

During 1993 and 1994, Winkler processed the settlement of about 800 to 900 TEFRA Barrister cases. In addition to working on the Barrister and Bromwell cases, Winkler also worked on some general litigation cases, provided large case audit assistance, assisted in the audit of "large taxpayers", and worked on an occasionally active large estate tax case.

Winkler signed petitioners' decision document on April 25, 1995, and then forwarded it to the Court for entry of decision. On May 2, 1995, the Court entered decision in petitioners' case. The relevant parts of the decision are set forth in table 2.

Table 2

|  |  | Additions to Tax | | |
|  |  | Sec. | Sec. | Sec. |
| Year | Deficiency | 6653(a)(1) | 6653(a)(2) | 6659 |
| 1978 | $14,606.59 | -- | -- | $2,921.32 |
| 1979 | 8,207.59 | -- | -- | 1,641.52 |
| 1981 | 1,144.00 | -- | -- | 227.00 |
| 1982 | 4,298.00 | -- | -- | -- |

The decision further provides that the entire deficiencies for 1978, 1979, 1981, and 1982 were subject to the section 6621(c) rate.

The Court served a copy of the decision on respondent's National Office, which received it on May 2, 1995. The copy was received in the Louisville office on May 8, 1995. On June 1,

1995, the Louisville office sent the administrative file and a copy of the decision document to the Cincinnati office. The Cincinnati office received this material on June 5, 1995.

As of June 1, 1995, the Louisville office recorded a total of 13 hours on petitioners' deficiency case.

Petitioners' deficiency case never was set for trial.

E. <u>Assessments; Payments</u>

A Form 2859, Request for Quick or Prompt Assessment, for 1978 was prepared and approved on August 16, 1995. On August 18, 1995, respondent assessed the deficiencies shown <u>supra</u> in table 2 and interest in the amounts shown in table 3.

Table 3

| Year | Interest |
|------|----------|
| 1978 | $65,336.10 |
| 1979 | 36,456.54 |
| 1981 | 4,689.52 |
| 1982 | 13,243.89 |

Bills for the assessed amounts were sent to petitioners on the same day. The first time petitioners were notified of the amounts of interest was when they received these bills.

On September 5, 1995, petitioners paid the entire amounts shown <u>supra</u> on table 2 (deficiencies and additions to tax) for 1978, 1979, 1981, and 1982. These payments were posted to petitioners' account as of September 8, 1995. In their letter enclosing these payments, petitioners requested "an abatement of the interest." See <u>supra</u> table 3.

Additional assessments, abatements, and credits after August 18, 1995, resulted in balances shown in table 4, payments of which by petitioners were posted on December 11, 1996 (as to 1978, 1981, and 1982), and December 24, 1996 (as to 1979).

Table 4

| Year | Interest | Penalty for Late Payments | Payment |
|------|----------|---------------------------|---------|
| 1978 | $65,316.82 | $73.03 | $65,389.85 |
| 1979 | 36,519.51 | 123.11 | 36,642.62 |
| 1981 | 4,974.51 | 5.53 | 4,980.04 |
| 1982 | 13,952.46 | 21.49 | 13,973.95 |

Petitioners have paid all tax and interest assessed for 1979, 1981, and 1982; no additional tax or interest needs to be assessed.

F.   The Abatement Process

At or about the time of petitioners' September 5, 1995, letter, petitioners also wrote to their Congressman.  On September 8, 1995, petitioners' Congressman wrote to respondent.

On September 22, 1995, in response to petitioners' September 5 letter, respondent thanked petitioners for their payment of $33,046.02 (the sums of the amounts on table 2, supra) and told them that (1) respondent had not yet gathered all of the information necessary to give to petitioners a complete answer to their abatement request letter, (2) respondent would contact petitioners within 30 days to inform them about the status of

their case, and (3) they need not take any further action with respect to their request.

On September 25, 1995, respondent wrote to petitioners' Congressman, stating as follows:

> Dr. Goettee paid the assessed tax and should now submit his request for abatement on Form 843. His request should be mailed to Internal Revenue Service, Philadelphia, Pennsylvania 19020. We have enclosed a Form 843 for his convenience.

On October 6, 1995, petitioners received from respondent (an office in Bensalem, Pennsylvania) a notice of deficiency for 1983. Respondent enclosed a Form 843 (Claim for Refund and Request for Abatement) with the 1983 notice of deficiency.

On October 9, 1995, petitioners wrote to the Cincinnati office, asking respondent to deal with all their tax matters from one office, because it "is completely overwhelming for us" to deal with two different offices about tax disputes arising from the same partnership. Petitioners enclosed a Form 843 requesting (1) an abatement of interest on 1983 taxes and (2) an abatement of 1983 penalties under section 6653.

On October 20, 1995, respondent further replied to petitioners' September 5 letter, in pertinent part as follows:

> You must file Form 843 for each year you are requesting an abatement of interest. We have enclosed Forms 843 for your convenience.

> You will receive a notice of the balance due within two to three weeks.

Please provide the information by Nov. 18, 1995. We have enclosed an envelope for your convenience.

On October 23, 1995, petitioners replied to respondent's October 20 letter. Evidently, the forms respondent had enclosed with the October 20 letter dealt with 1994 household employment taxes. Petitioners used, instead, copies of the Form 843 that respondent had included in the October 6 letter. Petitioners complied with the October 20 letter instructions by enclosing a separate Form 843 for each of the years 1978, 1979, 1981, and 1982, in the amounts shown in table 3, supra.

On February 5, 1996, respondent proposed to disallow petitioners' abatement request in full.[7] Respondent gave the following reasons to support this proposed decision: (1) The time petitioners' case was before this Court does not constitute a delay in the performance of a ministerial act, and (2) the delay in settling petitioners' case was not attributable to respondent.

Petitioners appealed respondent's proposed disallowance. On March 21, 1996, Samuel E. Fish, Jr. (hereinafter sometimes referred to as Fish), an Appeals officer in respondent's Baltimore, Maryland, Appeals Office (hereinafter sometimes

---

[7] The amounts listed in the Feb. 5, 1996, letter are slightly greater than the amounts claimed in petitioners' Forms 843. We assume that the difference, almost 2.2 percent for each year, represents the additional interest that had accrued after the Aug. 18, 1995, assessment. Supra table 3.

referred to as the Baltimore office), wrote to petitioners about their appeal.

On April 10, 1996, Rowland wrote to petitioners from the Cincinnati office in response to the letters from petitioners' Congressman and both of their Senators.  Her letter was essentially consistent with respondent's February 5 letter that denied petitioners' abatement requests in full.

On April 24, 1996, Becker traveled from Cincinnati to petitioners' residence in New Windsor, Maryland, to discuss their interest liability.  Becker gave to petitioners a Form 656 (Offer in Compromise).

On April 29, 1996, Becker wrote to petitioners, in pertinent part, as follows:

> I have also spoken with people from the offices of Congressman Roscoe B. Bartlett, Senator Barbara A. Mikulski and Senator Paul S. Sarbanes.  In each case, I have explained your situation and pointed out that the interest liability is fixed by statute.

> It appears that the only avenue available to you at this time is to prepare the necessary information and forms to submit an Offer in Compromise to the Collection Division. This can be done through the Internal Revenue Office in Frederick or through the Baltimore Office.

On May 29, 1996, petitioners submitted a Form 656 in which they offered respondent $40,000 to settle their interest liability for 1978, 1979, 1981, 1982.  Petitioners enclosed a

check for $40,000 with the May 29 Form 656.[8]  At respondent's request, on June 14, 1996, petitioners resubmitted their offer in compromise using a newer version of Form 656.  The June 14, 1996, Form 656 provided that if respondent rejected petitioners' offer, then respondent would return the $40,000 without interest.

Respondent denied petitioners' offer in compromise.  On June 25, 1996, petitioners appealed the denial and asked for a conference.  In response, on August 7, 1996, Fish arranged for a conference to be held on August 22, 1996, at the Baltimore office.

On August 14, 1996, Becker responded to petitioners' telephone call, as follows:

> Thank you for your phone call regarding the status of your case.  I am glad to hear, it finally made it to the Appeals Office in Baltimore.
>
> As promised, attached are copies of pages from the "Taxpayer Bill of Rights 2" relating to "Abatement of Interest and Penalties".  Since this is a very new legislative change the explanation is brief.  It will take some time to develop detailed guidelines.

---

[8]  Both sides' briefs agree that petitioners paid this $40,000 to respondent on May 15, 1996.  As we have found (infra text including table 5), respondent abated interest for the period Oct. 4, 1995, through Sept. 20, 1996.  Under these circumstances, it does not appear to make a difference whether the $40,000 was paid on May 29, 1996, as indicated in the stipulated Form 656 of that date, or was paid on May 15, 1996, as the parties agree on brief.

As you present your case to the Appeals Officer, you may want to mention the current change in the law and ask if the concept can be applied to your case.  It may help.

I hope your efforts are successful.

On July 30, 1996, Congress enacted the Taxpayer Bill of Rights 2 (TBOR 2), Pub. L. 104-168, 110 Stat. 1452.  TBOR 2 sec. 302(a), 110 Stat. at 1456, added section 6404(h)[9] which gives to this Court jurisdiction to review the Commissioner's refusal to abate interest under section 6404.  TBOR 2 sec. 302(b), 110 Stat. at 1458, provides that the amendments made by section 302(a) apply "to requests for abatement after the date of the enactment of" TBOR 2.

In lieu of the August 22 conference in the Baltimore office, petitioners and Fish conferred by telephone on September 4, 1996. At Fish's request, on September 4, 1996, petitioners withdrew their offer in compromise.

On September 13, 1996, Fish advised petitioners to prepare, sign, and submit a new Form 843 for each year for which they sought an abatement, so that the Forms 843 would be dated after

---

[9] This provision was enacted as sec. 6404(g).  Through a series of amendments, former sec. 6404(g) was redesignated as sec. 6404(i).  Secs. 3305(a) and 3309(a) of the Internal Revenue Service Restructuring and Reform Act of 1998 (RRA 1998), Pub. L. 105-206, 112 Stat. 685, 743, 745.  These amendments apply to taxable years beginning after July 22, 1998.  RRA 1998 sec. 3305(b), 112 Stat. at 743.  Sec. 6404(i) then was redesignated as sec. 6404(h) by sec. 112(d)(1)(B) of the Victims of Terrorism Tax Relief Act of 2001, Pub. L. 107-134, 115 Stat. 2427, 2435.  We will refer to this subsection using its current designation, sec. 6404(h).

July 31, 1996, the effective date for the relevant provisions in TBOR 2. Fish advised petitioners to do this to protect their right to petition the Tax Court to review the Commissioner's decision about petitioners' abatement requests. On October 3, 1996, petitioners submitted new Forms 843.

On October 25, 1996, Fish recommended that (1) interest should be abated for the period October 4, 1995, through September 20, 1996, because for that period "taxpayers were continually given incorrect advise [sic] and subject to the processing timeframes of the ill advised offer and interest abatement claims[, and]" (2) interest should not be abated for any period before petitioners paid the taxes because--

> There were no ministerial or managerial acts which contributed to errors or delays, which were not part of the tax court/shelter process. The taxpayers were offered opportunities to resolve the matter in earlier years, as well as advised that a posted cash bond would suspend the accrual of interest.

Fish's analysis presented the dollar effects of his recommendations on petitioners' interest abatement claims as shown in table 5.

Table 5

| Year | Claimed | Disallowed | Allowed |
|------|---------|------------|---------|
| 1978 | $66,763 | $65,439 | $1,324 |
| 1979 | 37,252 | 36,508 | 744 |
| 1981 | 4,792 | 4,688 | 104 |
| 1982 | 13,533 | 13,143 | 390 |
| 1983 | 4,270 | 4,129 | 141 |

Fish's recommendations were approved on October 31, 1996, and a notice of disallowance was issued to petitioners on November 13, 1996, setting forth the amounts shown supra under "Allowed", disallowing the balance of the claims, but not stating the amounts disallowed.

## G. Other Matters; Conclusions

At some point, probably in December 1996, possibly in January 1997, respondent returned to petitioners the $40,000 that petitioners paid in connection with their offer in compromise.

Tax assessments in the amounts of $1,360 for 1979 and $87 for 1981 are not subject to the section 6621(c) rate.

Respondent has overassessed interest in at least the amounts of $108.33 for 1981 and $298.47 for 1982.

Respondent's failure to abate interest for the period December 2, 1993, through October 26, 1994, was not an abuse of discretion.

Respondent's failure to abate interest for the period December 14, 1994, through January 25, 1995, was not an abuse of discretion.

Respondent's failure to abate interest for the period January 26 through February 24, 1995, was an abuse of discretion. Respondent concedes that there should be an abatement of interest for the period February 25 through April 24, 1995.

Respondent's failure to abate interest for the period April 25 through May 2, 1995, was not an abuse of discretion.

OPINION

The instant case presents two categories of issues: (1) Whether respondent's failure to abate interest for certain time periods constitutes an abuse of discretion, and (2) whether respondent's interest computations are correct.  The proper treatment of petitioners' offer in compromise payment arguably falls into both categories.[10]  We consider first the issues of abatements for certain time periods.

## I.  Abatements of Interest

Petitioners contend that respondent's failure to abate interest for the periods of (1) December 2, 1993, through October 26, 1994 (the first period), and (2) December 14, 1994, through May 2, 1995 (the second period), constitutes an abuse of discretion because the interest that accrued during each of these periods is attributable to a delay in the performance of a ministerial act by respondent.  Petitioners also urge us to order abatement for unspecified additional periods.

Respondent concedes that an abatement of interest for part of the second period--February 25 through April 25, 1995--is appropriate.  Respondent contends, however, that the failure to

---

[10]  Petitioners also filed a motion to shift the burden of proof.  Because we do not decide any issues based on the burden of proof, we deny petitioners' motion as moot.

abate interest for the remaining periods does not amount to an abuse of discretion because (1) there were no delays during these periods, and (2) even if there were, the delays were the result of general administrative decisions, not respondent's failure to perform a ministerial act.

We agree with respondent as to the first period, as to parts of the second period, and as to the unspecified additional periods.  We agree with petitioners as to part of the second period.

Section 6404(e)(1)[11] authorizes respondent to abate assessed
interest attributable to error or delay in an IRS officer or

---

[11] Sec. 6404(e)(1) provides, in pertinent part, as follows:

SEC. 6404. ABATEMENTS.

    *  *  *  *  *  *  *

(e) Assessments of Interest Attributable to Errors and
Delays by Internal Revenue Service.--

  (1) In general.--In the case of any assessment of
interest on--

    (A) any deficiency attributable in whole or
in part to any error or delay by an officer or
employee of the Internal Revenue Service (acting
in his official capacity) in performing a
ministerial act, or

    (B) any payment of any tax described in
section 6212(a) to the extent that any error or
delay in such payment is attributable to such an
officer or employee being erroneous or dilatory in
performing a ministerial act,

the Secretary may abate the assessment of all or any
part of such interest for any period. For purposes of
the preceding sentence, an error or delay shall be
taken into account only if no significant aspect of
such error or delay can be attributed to the taxpayer
involved, and after the Internal Revenue Service has
contacted the taxpayer in writing with respect to such
deficiency or payment.

Sec. 301(a) of TBOR 2, Pub. L. 104-168, 110 Stat. 1452, 1457
(1996), amended sec. 6404(e) to permit abatement of interest for
"unreasonable" error and delay in the performance of a
"ministerial or managerial" act. The TBOR 2 amendments of sec.
6404(e) apply to interest accruing with respect to deficiencies
or payments for taxable years beginning after July 30, 1996.
TBOR 2 sec. 301(c), 110 Stat. at 1457. Thus, the amendments do
not apply in the instant case. Woodral v. Commissioner, 112 T.C.
19, 25 n.8 (1999).

employee's performing a ministerial act, with certain restrictions not applicable in the instant case.

As we stated in <u>Krugman v. Commissioner</u>, 112 T.C. 230, 238-239 (1999),

> Congress intended for the Commissioner to abate interest under section 6404(e) "where failure to abate interest would be widely perceived as grossly unfair" but not that it "be used routinely to avoid payment of interest". H. Rept. 99-426, at 844 (1985), 1986-3 C.B. (Vol. 2) 1, 844; S. Rept. 99-313, at 208 (1986), 1986-3 C.B. (Vol. 3) 1, 208.

Section 6404(h)[12] authorizes this Court to decide whether respondent's failure to abate such interest is an abuse of discretion and, if so, then to order an abatement.

Respondent does not contend that any significant aspect of the delay is attributable to petitioners. Sec. 6404(e)(1) (final flush language). Accordingly, we are left to consider whether

---

[12] Sec. 6404(h) provides, in pertinent part, as follows:

SEC. 6404. ABATEMENTS.

\* \* \* \* \* \* \*

(h) Review of Denial of Request for Abatement of Interest.--

(1) In general.--The Tax Court shall have jurisdiction over any action brought by a taxpayer who meets the requirements referred to in section 7430(c)(4)(A)(ii) to determine whether the Secretary's failure to abate interest under this section was an abuse of discretion, and may order an abatement, if such action is brought within 180 days after the date of the mailing of the Secretary's final determination not to abate such interest.

(2) Special rules.--

(A) Date of mailing.--Rules similar to the rules of section 6213 shall apply for purposes of determining the date of the mailing referred to in paragraph (1).

(B) Relief.--Rules similar to the rules of section 6512(b) shall apply for purposes of this subsection.

(C) Review.--An order of the Tax Court under this subsection shall be reviewable in the same manner as a decision of the Tax Court, but only with respect to the matters determined in such order.

(1) any delays petitioners identified are respondent's delays in performing a ministerial act, and (2) respondent's failure to abate interest for any period constitutes an abuse of discretion.

Section 6404(e) does not define the term "ministerial act". Lee v. Commissioner, 113 T.C. 145, 149 (1999).  The governing regulation[13] defines the term to mean a procedural or mechanical

---

[13]  Sec. 301.6404-2T(b), Temporary Proced. & Admin. Regs., 52 Fed. Reg. 30163 (Aug. 13, 1987), provides as follows:

Sec. 301.6404-2T Definition of ministerial act (temporary).

(b) Ministerial act--(1) Definition.  The term "ministerial act" means a procedural or mechanical act that does not involve the exercise of judgment or discretion, and that occurs during the processing of a taxpayer's case after all prerequsites to the act, such as conferences and review by supervisors, have taken place.  A decision concerning the proper application of federal tax law (or other federal or state law) is not a ministerial act.

(2) Examples.  The definition of ministerial act may be illustrated by the following examples.

Example (1). A taxpayer moves from one state to another before the Internal Revenue Service selects the taxpayer's income tax return for examination.  A letter explaining that the return has been selected for examination is sent to the taxpayer's old address and then forwarded to the new address.  The taxpayer timely responds, asking that the audit be transferred to the Service's district office that is nearest the new address.  The group manager approves the request.  After the request for transfer has been approved, the transfer of the case is a ministerial act.  The Commissioner may (in his or her discretion) abate interest attributable to a delay in transferring the case.

Example (2).  An examination of a taxpayer's income tax return reveals a deficiency with respect to which a notice of deficiency will be issued.  After the taxpayer and the Internal Revenue Service have identified all agreed and
(continued...)

act that does not involve the exercise of judgment or discretion, and that occurs during the processing of a taxpayer's case after all prerequisites to the act, such as conferences and review by

---

[13](...continued)
unagreed issues, the notice has been prepared and reviewed (including review by District Counsel, if necessary) and any other relevant prerequisites have been completed, the issuance of the notice of deficiency is a ministerial act. The Commissioner may (in his or her discretion) abate interest attributable to a delay in issuing the notice.

Example (3). A taxpayer invested in a tax shelter and reported a loss from the tax shelter on the taxpayer's income tax return. Internal Revenue Service personnel conducted an extensive examination of the tax shelter, and the processing of the taxpayer's case was delayed during such examination. Because the period of limitations on assessment was about to expire, the taxpayer executed a consent to extend the period of limitations. The time required to process the taxpayer's case was not a result of a delay in performing a ministerial act; consequently, interest attributable to this period cannot be abated under paragraph (a) of this section.

Example (4). A revenue agent is sent to a training course, and the agent's supervisor decides not to reassign the agent's cases. During the training course, no work is done on the cases assigned to the agent. Neither the decision to send the agent to the training course nor the decision not to reassign the agent's cases is, under the circumstances, a ministerial act. Thus, interest attributable to the delay cannot be abated.

Example (5). A taxpayer who claimed a loss from a tax shelter on the taxpayer's income tax return is notified that the Internal Revenue Service intends to examine the return. However, because of other work priorities and resource limitations, a decision is made not to commence the examination for an extended period thereafter. The decision not to commence the examination involves the exercise of judgment and discretion and is not a ministerial act; consequently, interest attributable to the period of delay cannot be abated.

supervisors, have taken place.  Sec. 301.6404-2T(b)(1), Temporary Proced. & Admin. Regs., 52 Fed. Reg. 30163 (Aug. 13, 1987).[14] The regulation further provides that a decision concerning the proper application of Federal tax law is not a ministerial act. Id.

The definition of "ministerial act" in the governing regulation closely tracks the legislative history relating to section 6404(e).  See Lee v. Commissioner, 113 T.C. at 149-150 (setting forth portions of the legislative history of section 6404(e) relating to the definition of "ministerial act"); see

---

[14]    Sec. 6232(a) of the Technical and Miscellaneous Revenue Act of 1988 (TAMRA 1988), Pub. L. 100-647, 102 Stat. 3342, 3734-3735, added subsec. (e) to sec. 7805.  Sec. 7805(e)(2) provides that "Any temporary regulation shall expire within 3 years after the date of issuance of such regulation."  Sec. 7805(e)(2) applies to any temporary regulation issued after Nov. 20, 1988.  TAMRA 1988 sec. 6232(b), 102 Stat. at 3735.  The regulation herein involved was issued before Nov. 20, 1988, and thus the "sunset" provision of sec. 7805(e)(2) does not apply to this regulation.

The final regulations under sec. 6404 were issued on Dec. 18, 1998.  The final regulations generally apply to interest accruing on deficiencies or payments of tax described in sec. 6212(a) for tax years beginning after July 30, 1996.  See sec. 301.6404-2(d)(1), Proced. & Admin. Regs.  Accordingly, the final regulations are inapplicable to the instant case, and sec. 301.6404-2T, Temporary Proced. & Admin. Regs., supra, effective for taxable years beginning after Dec. 31, 1978, but before July 30, 1996, does apply.  See sec. 301.6404-2T(c), Temporary Proced. & Admin. Regs., supra.

We agree with petitioners that the temporary regulation applies to the instant case; we disagree with respondent's statements on brief that the final regulations are "the applicable regulations".

also S. Rept. 99-313, at 209, 1986-3 C.B. (Vol. 3) 1, 209 ("The

IRS may define a ministerial act in regulations.").  This

consistency between section 301.6404-2T(b)(1), Temporary Proced.

& Admin. Regs., supra, and the legislative history of section

6404(e) satisfies the concern that we might otherwise have had

about the regulation.  Cf. Minahan v. Commissioner, 88 T.C. 492,

505 (1987) (stating:

> When the regulation interpreting a statute is written by the
> very agency whose "abusive actions or overreaching" were
> intended to be deterred by that statute, we must be
> especially vigilant to insure that the regulation
> "harmonizes with the plain language of the statute, its
> origins, and its purpose."  Durbin Paper Stock Co. v.
> Commissioner, 80 T.C. [252,] at 257 [(1983)].).

We apply the foregoing first to the events of the first

period (December 2, 1993, through October 26, 1994), then to the

events of the second period (December 14, 1994, through May 2,

1995), and finally to the events of unspecified additional

periods.

A.  First Period (Dec. 2, 1993, through Oct. 26, 1994)

Petitioners contend as follows on brief:

> Respondent's actions to calculate the deficiency and to
> transmit decision documents to Petitioners should have taken
> no more than ten days.  Even so, Respondent's Appeals Office
> did not send a decision document to Petitioners for their
> signature until October 26, 1994.  The time period for this
> ministerial action to be completed by Respondent encompassed
> 10 months and 24 days, after Petitioners' transmittal of
> their canceled checks to Respondent.  Such delay in
> performing a simple ministerial act warrants abatement of
> the interest accruing during the period December 2, 1993 to
> October 26, 1994.

December 2, 1993 (the start of the first period), is the date petitioners mailed to respondent their verification information.  October 1, 1994, is the earliest date respondent took any action in processing the settlement of petitioners' case, and October 15, 1994, is about the time when respondent began to prepare petitioners' settlement documents.  October 26, 1994 (the end of the first period), is the date Rowland mailed the settlement documents to petitioners.

Substantially all of the first period consists of the time before Rowland worked on petitioners' response to the settlement offer.  This delay resulted from respondent's prioritization decisions.

Appeals officers in the Cincinnati office managed multiple priorities while processing the Barrister cases.  Cases nearing the end of the limitations period, service center claim cases, and cases calendared for trial in Cincinnati and Columbus, Ohio, took priority over the Barrister cases.

The record shows that respondent (1) established a list of priorities which places the Barrister cases below three other types of cases in terms of priority, and (2) processed the Barrister cases on an alphabetized first in, first out basis as detailed supra in our findings.  This supports respondent's contention that respondent's inaction during the period December 2, 1993, to October 1, 1994, is attributable to respondent's

decision regarding case priorities. Such a showing, absent evidence regarding the then prevailing circumstances, paints only a partial picture, however. To complete the picture, we examine the circumstances as they existed during the period to determine whether respondent's priority structure completely explains respondent's inaction.

Rowland testified, and we found, that the Cincinnati office was responsible for cases calendared for trial at Cincinnati and Columbus, Ohio. Thus, during the first period the primary attention of the Cincinnati office was focused on cases other than the Barrister cases.

Rowland testified, and we found, that she maintained her normal caseload, about 100-120 cases, in addition to working on her share of the Barrister cases, about 75 in number. Rowland was thus managing a caseload during the period that was significantly larger than her normal caseload. Rowland testified, and we found, that (1) the settlement letters generated a significant and generally prompt response from Barrister taxpayers, more than half the Barrister taxpayers who responded to the settlement offer submitted their verification information within the requested 10 days; (2) she fielded many phone calls from Barrister taxpayers regarding the settlement; and (3) it took an average of 26 calendar days to process the settlement of a Barrister case. On these facts, we conclude that

respondent's priority structure, coupled with the heavy demands placed on Rowland's time, contributed to respondent's inaction in petitioners' case during the bulk of the first period.

Section 301.6404-2T(b)(1), Temporary Proced. & Admin. Regs., supra, provides that "The term 'ministerial act' means a procedural or mechanical act that does not involve the exercise of judgment or discretion". (Emphasis added.) Examples (4) and (5) in section 301.6404-2T(b)(2), Temporary Proced. & Admin. Regs., supra, make it plain that, ordinarily, the making of decisions about how to prioritize cases constitutes the exercise of judgment or discretion.

We conclude that Rowland's delay in beginning to process petitioners' response to the settlement offer is properly attributable to respondent's reasonable prioritization decisions, and thus is not attributable to error or delay in performing a ministerial act.

Once Rowland began to process petitioners' response, her actions included the accomplishment of prerequisites (matching petitioners' verification materials to the amounts claimed on their tax returns, determining that petitioners were not involved in a shelter other than TEA for the relevant years) and the ministerial act of computing the amounts of the deficiencies and additions to tax. It does not appear that there was any delay in preparing the settlement documents and mailing them to

petitioners.  Compare example (2) to sec. 301.6404-2T(b)(2), Temporary Proced. & Admin. Regs., supra.

From the foregoing, we conclude that there was no abuse of discretion in respondent's failure to abate interest for any part of the first period.

We hold for respondent on this issue.

B.  Second Period (Dec. 14, 1994, through May 2, 1995)

On opening brief, petitioners contend as follows with regard to the second period:

> Petitioners sent their executed decision document to Cincinnati Appeals Office on December 14, 1994.  Almost four and one-half months passed before it was signed by Mr. Winkler on April 25, 1995.  Another week passed before it was actually filed with the United States Tax Court on May 2, 1995.  Due to the delay evident in such time lag, Petitioners seek abatement of interest for the period running from December 14, 1994 to May 2, 1995.

On answering brief, respondent replies as follows to petitioners' contentions:

> While respondent does not necessarily agree with petitioners' argument on this particular matter and does not concur that counter-signing and filing stipulated decision documents implicates a ministerial decision, respondent will concede that an abatement of interest, for the period from February 25, 1995 through April 25, 1995, should be allowed to petitioners in the unusual circumstances of this case. In making this concession, however, respondent notes two points detailed below.

The two points respondent refers to are as follows:

1.  Respondent's counsel proceeded with settling individual Barrister cases out of alphabetical order "where a taxpayer or representative contacted respondent's counsel

at random.  Petitioners, in their tax shelter case, never initiated this type of contact with respondent's counsel."

2.  As a result of petitioners' letter accompanying the signed decision document, "Any attorney would have to consider and determine whether petitioners intended to enter into the settlement."

Evidently, respondent had not communicated this concession to petitioners before petitioners sent their answering brief to the Court.  Consequently, petitioners have not had the opportunity to point out any implications that respondent's concession of 60 days of the second period might have on the 80 days of the second period that remain in dispute.

We take the foregoing into account in our analysis.

December 14, 1994, is the date petitioners mailed to respondent the executed decision document, and May 2, 1995, is the date we entered decision in petitioners' case.  Respondent did not explain the significance of February 25, 1995.  April 25, 1995, is the date Winkler signed the decision document in petitioners' case.

Between December 14, 1994, and December 23, 1994, Rowland (1) received petitioners' signed decision document, (2) prepared and signed an appeal transmittal and case memorandum which outlined the terms of the settlement, and (3) forwarded the appeals transmittal and case memorandum to Becker for his

approval.  On January 13, 1995, Becker (1) signed and approved the appeals transmittal and case memorandum, (2) prepared a letter informing petitioners that the settlement offer had been approved, and (3) delivered the documents to the records office of the Cincinnati office which had 5 days to transfer the documents to Winkler for his review and signature.  Taking into account transmission time, including weekends, it is reasonable to conclude that Winkler would have received the documents by about January 25, 1995.

The foregoing activities do not constitute ministerial acts because they are acts prerequisite to the processing of the settlement agreement between petitioners and respondent.  Section 301.6404-2T(b)(1), Temporary Proced. & Admin. Regs., supra, provides that "The term 'ministerial act' means a procedural or mechanical act * * * that occurs during the processing of a taxpayer's case after all prerequisites to the act, such as conferences and review by supervisors have taken place." Rowland's preparation of the appeals transmittal and case memorandum and Becker's review thereof thus are not ministerial acts.  Id.

We conclude that, for the period from December 14, 1994, through about January 25, 1995, there was no error or delay by an IRS employee in performing a ministerial act, within the meaning of section 6404(e)(1)(A), and thus respondent did not have

authority to abate interest in petitioners' case. Similarly, there was no error or delay for the period April 25 (when Winkler signed the settlement document), through May 2, 1995, when the decision was entered by the Tax Court.

The remaining 3 months of the second period are more complicated. Respondent's two proffered explanations are not helpful. The first explanation, dealing with taking cases out of alphabetical order, related to the first period (ending October 26, 1994) and not to the second period. The second explanation, dealing with uncertainty as to petitioners' intent to settle, evidently was resolved by Becker, not later than January 13, 1995, when he notified petitioners in writing that the proposed settlement "has been approved."

We consider first whether Winkler's actions with respect to the settlement of petitioners' case constituted ministerial acts.

We have found that in 1993 arrangements were made to have the Cincinnati office take on part of the work of settling Barrister cases. About July 1993, Barrister cases were assigned to Rowland and her Cincinnati office colleagues. For about the first 6 months that the Cincinnati office processed Barrister cases, proposed decision documents were sent to Winkler and Craig for approval before the documents were sent to the taxpayers. Thereafter, the Cincinnati office was deemed to be sufficiently proficient at drafting these documents, so that that office sent

those documents to the taxpayers without review by Winkler or Craig. Winkler then reviewed the format and contents of the decision documents, signed them, and forwarded them to the Court for entry of decision. These findings suggest that, although Winkler's review role had substantially diminished by early 1994, at that point his actions with regard to Barrister case settlements still were more than ministerial.

However, our focus is on the status of Winkler's actions in early 1995, a year later. We believe that the clearest evidence of record on that point is the stipulated January 13, 1995, letter from Becker to petitioners informing petitioners that the settlement they reached with Rowland, "as reflected in the stipulation-decision document, has been approved." Becker's letter to petitioners goes on to state that "We have forwarded the stipulation you signed to District Counsel for filing with the United States Tax Court." From this we conclude that Becker, acting in his official capacity on behalf of respondent, was assuring petitioners that by January 13, 1995, (1) all the actions involving the exercise of judgment or discretion in petitioners' case had already occurred, and (2) only ministerial acts remained before the stipulated decision was submitted to this Court. From the foregoing, we conclude it is more likely than not that Winkler's remaining tasks--signing the stipulation and causing it to be delivered to this Court--were ministerial.

Examples (4) and (5) of section 301.6404-2T(b)(2), Temporary Proced. & Admin. Regs., supra, show that assigning priorities in the processing of work can constitute the exercise of judgment and discretion. We have found that Winkler gave priority to working on cases calendared for trial by the Court. If the 3-month delay in Winkler's signing the stipulation was attributable to this prioritizing, then it would appear that, under the regulation, Winkler was not "dilatory in performing a ministerial act." Sec. 301.6404-2T(a)(final flush language), Temporary Proced. & Admin. Regs., supra. Under these circumstances, abatement of interest for this 3-month period would not be authorized under the statute and the regulation.

We have not found, and respondent does not direct our attention to, any evidence in the record herein that the 3-month delay (or any part thereof) was in fact properly attributable to Winkler's prioritizing. Nevertheless, in the last brief filed in the instant case, respondent concedes "that an abatement of interest, for the period from February 25, 1995 through April 25, 1995, should be allowed to petitioners in the unusual circumstances of this case." Respondent does not explain why this concession is made, nor why the concession period begins on February 25, 1995. We have not identified from the record herein any event on or about February 25, 1995, that might be relevant to a conclusion that a section 6404 status had changed. Compare

<u>Jacobs v. Commissioner</u>, T.C. Memo. 2000-123, with <u>Berry v. Commissioner</u>, T.C. Memo. 2001-323.  Because respondent's concessions came so late in our proceedings, petitioners have been deprived of the opportunity to explore the events of February 25, 1995, or thereabouts.

Taking into account the fact and timing of respondent's concession, we conclude it is more likely than not that respondent has conceded that there was an abuse of discretion in failing to abate interest for the 2-month period February 25 through April 24, 1995.[15]  We conclude that the period January 25 through February 24, 1995, should be treated the same as the conceded period.

We hold for respondent as to December 14, 1994, through January 24, 1995; for petitioners as to January 25 through April 24, 1995; and for respondent as to April 25 through May 2, 1995, on this issue.

C.  <u>Additional Periods</u>

On answering brief, petitioners urge that we order abatement for "Additional periods during the 14+ years of interest". Petitioners do not direct our attention to any specific periods,

---

[15]  We recognize that respondent's concession includes Apr. 25, 1995.  However, we refuse to give effect to that 1 day because the record clearly and indisputably shows that on that day Winkler moved the process along.  Indeed, the parties have so stipulated.

evidently preferring that we conduct a detailed search. We decline to do so.

We hold for respondent on this issue.

D. Abatement Periods--Summary

We hold for petitioners that respondent's failure to abate interest for the period January 25 through April 24, 1995, was an abuse of discretion and will order abatement for this period. We hold for respondent as to all other periods placed in dispute in the instant case.

## II. Interest Computations

Respondent twice computed petitioners' interest liability: once before the August 18, 1995, assessment and once before trial. Petitioners contend that both of respondent's interest computations contain numerous errors, and that respondent's failure to correct such errors constitutes an abuse of discretion. Respondent contends that, after taking respondent's concessions into account, respondent's trial computations are correct.[16]

Before reaching the merits of these disputes, we pause to discuss our jurisdiction to correct respondent's computations.

---

[16] Petitioners point out that, if we were to agree with any of their contentions, then the "bottom line" would take into account the effect of compounding interest on the interest that we would have concluded should not have been assessed. E.g., RJR Nabisco, Inc. v. United States, 955 F.2d 1457 (11th Cir. 1992). Thus, in general the amounts at stake are greater than the amounts formally in dispute.

See, e.g., <u>Ewing v. Commissioner</u>, 118 T.C. 494, 498 (2002).  Our jurisdiction to correct error in respondent's interest computations stems from section 6404(h)(2)(B), which provides that rules similar to the rules of section 6512(b) apply for purposes of section 6404(h).  <u>Supra</u> note 12.  Section 6512(b) generally defines this Court's jurisdiction with respect to overpayments.  See <u>Winn-Dixie Stores, Inc. & Subs. v. Commissioner</u>, 110 T.C. 291, 294 (1998).  Section 6512(b) provides, inter alia, that if a taxpayer properly invokes our overpayment jurisdiction under section 6512(b), then we have jurisdiction to determine the amount of the taxpayer's overpayment.  This jurisdiction under section 6512 also permits us to redetermine a taxpayer's statutory interest.  <u>Lincir v. Commissioner</u>, 115 T.C. 293, 298 (2000), affd. 32 Fed. Appx. 278 (9th Cir. 2002); see <u>Zfass v. Commissioner</u>, 118 F.3d 184, 192 n.9 (4th Cir. 1997), affg. T.C. Memo. 1996-167.

Petitioners have paid all the tax and interest assessed for 1979, 1981, 1982, and the parties agree that there is no additional tax or interest that needs to be assessed. Respondent's concession that interest should be abated for the period of time beginning on February 25, 1995, and ending on April 25, 1995, results in an overpayment as to each of the years in issue.  Accordingly, pursuant to section 6404(h)(2)(B), we have jurisdiction to determine the amount of petitioners'

overpayment, and, in order to do so, we have jurisdiction to redetermine the correct amount of the interest on their original underpayments.

Petitioners assign a number of errors to respondent's interest computations.  We consider each of petitioners' contentions in turn.

A.  Start Dates

The parties agree that June 7, 1982, the date respondent issued to petitioners their 1981 refund, is the correct start date for 1981.  The parties disagree as to what are the correct start dates for 1979 and 1982.

1. 1979

Relying on Avon Products, Inc. v. United States, 588 F.2d 342 (2d Cir. 1978), petitioners contend that June 28, 1982, the date respondent issued to petitioners a refund for 1979 plus interest thereon, is the correct start date for 1979 because petitioners did not have the use of respondent's money before that date.  Relying on Rev. Proc. 94-60, 1994-2 C.B. 774, respondent contends that January 1, 1982, the date respondent began to accrue interest on petitioners' overpayment, is the correct start date for 1979.  Respondent maintains that this approach "comports with" Avon Products, Inc. v. United States, supra.

We agree with respondent's conclusion.

Section 6601(a)[17] provides the general rule that interest on an underpayment shall accrue during the period from the last date prescribed for payment until the date paid at the underpayment rate established under section 6621.  As we stated in <u>Intel Corp. & Consol. Subs. v. Commissioner</u>, 111 T.C. 90, 92 (1998):

> Section 6601 reflects the "use of money" principle: "That is, the party who has the use of the money pays interest up until the event which causes the party no longer to have use of that money."  [<u>BankAmerica Corp. v. Commissioner</u>, 109 T.C. 1, 14 (1997).][18]  * * *

Under section 6601(a), interest on an underpayment begins to accrue when the tax becomes both due and unpaid.  <u>Avon Products</u>

---

[17]  SEC. 6601.  INTEREST ON UNDERPAYMENT, NONPAYMENT, OR EXTENSIONS OF TIME FOR PAYMENT, OF TAX.

   (a) General Rule.--If any amount of tax imposed by this title [title 26, the Internal Revenue Code] (whether required to be shown on a return, or to be paid by stamp or by some other method) is not paid on or before the last date prescribed for payment, interest on such amount at an annual rate established under section 6621 shall be paid for the period from such last date to the date paid.

The later amendment of this provision, by sec. 1511(c)(11) of TRA 1986, 100 Stat. at 2745, applies to interest for periods after Dec. 31, 1986, TRA 1986 sec. 1511(d), 100 Stat. 2746, and so it does not affect our search for the starting date for interest on the 1979 and 1982 underpayments.

[18]  One may fairly contend that this principle has been eroded by various provisions, including sec. 6621(c) (discussed <u>infra</u> at C.) and the interest abatement provision that is the subject of the instant proceeding.  However, the "use of money" principle remains an appropriate basis for decision where it has not been modified by statute, as in the instant issue.  See, e.g., <u>Dang v. Commissioner</u>, 259 F.3d 204, 208 n.4 (4th Cir. 2001), affg. an unreported order and decision of this Court entered July 21, 2000; <u>BankAmerica Corp. v. Commissioner</u>, 109 T.C. 1, 14-16 (1997).

Inc. v. United States, 588 F.2d at 344.  The last date prescribed
for payment of income tax is generally the due date for filing
the tax return without regard to any extension of time for
filing.  See sec. 6601(b).

Petitioners did not owe any 1979 income tax as of the due
date for filing their 1979 tax return--April 15, 1980.  On their
1981 tax return, petitioners claimed flowthrough items in respect
of their investment in TEA.  Petitioners then carried back
"credits/losses" from 1981 to 1978 and then to 1979, which
resulted in an overpayment for 1979.[19]  Under subsections (a) and
(b)(2) of section 6611, interest on a refund of an overpayment is
calculated from the date of the overpayment.  Section 6611(f)[20]

_____

[19]   Respondent states that petitioners carried back from
1981 to 1978 "the investment credit".  Petitioners state they
carried back "actual losses".  The parties stipulate that
petitioners carried back "credits/losses".  The parties have not
favored us with petitioners' 1981 tax return or claim for refund
for 1979, and so we do not have a basis in the record for greater
precision as to what was carried back.  Although sec. 6611(f)
deals with net operating losses in par. (1) and credits in par.
(2)(A), infra note 20, we are fortunate in that for our purposes
the relevant rules of pars. (1) and (2)(A) are identical.

[20]   Sec. 6611(f) provides, in pertinent part, as follows:

SEC. 6611.   INTEREST ON OVERPAYMENTS.

*     *     *     *     *     *     *

(f)  Refund of Income Tax Caused by Carryback or
Adjustment for Certain Unused Deductions.--

(1) Net operating loss or capital loss carryback.
--For purposes of subsection (a), if any overpayment of
(continued...)

prescribes the date interest begins to accrue on an overpayment

created by a "credits/losses" carryback. Section 6611(f) as in

effect for June 28, 1982, the date when respondent issued to

petitioners their refund for 1979,[21] provided that for these

purposes the overpayment is deemed to have been made after the

last day of the taxable year in which the carryback arises. The

carryback which resulted in an overpayment for 1979 arose in

---

[20](...continued)
tax imposed by subtitle A [relating to income taxes] results from a carryback of a net operating loss or net capital loss, such overpayment shall be deemed not to have been made prior to the close of the taxable year in which such net operating loss or net capital loss arises.

    (2) Certain credit carrybacks.--

       (A) In general.--For purposes of subsection (a), if any overpayment of tax imposed by subtitle A results from a credit carryback, such overpayment shall be deemed not to have been made before the close of the taxable year in which such credit carryback arises * * *.

    Sec. 1055(b)(1) of the Taxpayer Relief Act of 1997 (TRA 1997), Pub. L. 105-34, 111 Stat. 788, 944, redesignated par. (2) of sec. 6611(f) as par. (3).

    [21] Sec. 346(c)(1)(A) and (B) of TEFRA 1982, 96 Stat. at 637, substituted the phrase "the filing date for" for the phrase "the close of" in each place the latter phrase appeared in pars. (1) and (2)(A) of sec. 6611(f). The amendments were effective for interest accruing after Oct. 3, 1982. See TEFRA 1982 sec. 346(d)(2), 96 Stat. at 638. Interest on petitioners' overpayment for 1979 accrued from Jan. 1 through June 16, 1982. Thus, the amendments do not affect interest on petitioners' overpayment for 1979.

1981, and thus the date of petitioners' overpayment for 1979 was deemed to be January 1, 1982.

Consistent with these provisions, respondent accrued interest on petitioners' 1979 overpayment from January 1, 1982.

As a result of the foregoing, we conclude that petitioners are deemed to have had the use of their refund on account of their carryback(s) to 1979 from January 1, 1982. The 1979 refund amounted to $10,375.38, consisting of $9,568 plus $807.38 interest. The parties settled the deficiency proceeding in this Court by agreeing to a deficiency of $8,207.59 for 1979, plus $1,641.52 addition to tax under section 6659. The 1979 deficiency resulted from disallowance of part of the carryback from 1981.

As we have noted, section 6601(a) provides the general rule for interest on underpayments. However, section 6601(d),[22] as in

---

[22] Sec. 6601(d) provides, in pertinent part, as follows:

SEC. 6601.  INTEREST ON UNDERPAYMENT, NONPAYMENT, OR
            EXTENSIONS OF TIME FOR PAYMENT, OF TAX.

*    *    *    *    *    *    *

(d)  Income Tax Reduced by Carryback or Adjustment for Certain Unused Deductions.--

(1)  Net operating loss or capital loss carryback.--If the amount of any tax imposed by subtitle A is reduced by reason of a carryback of a net operating loss or net capital loss, such reduction in tax shall not affect the computation of interest under this section for the period ending with the last day of
(continued...)

effect for the disputed June 1-28, 1982, interest period,[23] provides that where the income tax has been reduced by carrybacks, interest is not to accrue for the period ending with the last day of the taxable year in which the carried back item arises.  The carryback to 1979, the disallowance of part of which resulted in the 1979 deficiency, arose in 1981, and thus the earliest date for interest on the 1979 underpayment is January 1, 1982.  This results in petitioners' underpayment interest starting date matching the overpayment interest starting date that they benefited from.

---

[22](...continued)
     the taxable year in which the net operating loss or net capital loss arises.

          (2)  Certain credit carrybacks.--

               (A) In general.--If any credit allowed for any taxable year is increased by reason of a credit carryback, such increase shall not affect the computation of interest under this section for the period ending with the last day of the taxable year in which the credit carryback arises  * * *.

     Sec. 1055(a) of TRA 1997, 111 Stat. 944, redesignated par. (2) of sec. 6601(d) as par. (3).

     [23]  Sec. 346(c)(2)(A) and (B) of TEFRA 1982, 96 Stat. at 637, 638, substituted the phrase "the filing date for" for the phrase "the last day of" in each place the latter phrase appeared in pars. (1) and (2)(A) of sec. 6601(d).  The amendments were effective for interest accruing after Oct. 3, 1982.  TEFRA 1982 sec. 346(d)(2), 96 Stat. at 638.  Interest on petitioners' overpayment for 1979 accrued from Jan. 1 through June 16, 1982. Thus, the amendments do not affect interest on petitioners' underpayment for 1979.

Putting it another way, as a result of the carryback(s), petitioners were deemed to have an overpayment as of January 1, 1982. As a result of the parties' settlement in the deficiency litigation, it developed that petitioners were not entitled to the bulk of that overpayment. Because the overpayment and interest were calculated with a starting date of January 1, 1982, the resulting underpayment and interest also are calculated with a starting date of January 1, 1982.

Petitioners' contention that interest does not begin to accrue until the date respondent issued to petitioners the refund appears to hinge on the fact that they did not have actual use of respondent's money until the date respondent issued the refund.

Interest has been defined as compensation for the use or forbearance of money. Deputy v. du Pont, 308 U.S. 488, 498 (1940). In this sense, the payment of interest serves as a proxy for actual use of the money. Petitioners received interest on their 1979 refund which began to accrue as of January 1, 1982. Consistent with the definition of interest, petitioners are treated as having had the use of respondent's money (i.e., what the parties agreed in their settlement papers was respondent's money) as of January 1, 1982, even though they did not have actual use of the refunded dollars until respondent issued the refund for 1979.

However, the period beginning January 1, 1982, includes a 12-day period--June 16-28, 1982--during which respondent had the money and for which respondent did not pay interest to petitioners. On brief, each side vigorously disputes the other side's contentions as to this 12-day period. When we clear away the parties' language of conflict, it appears that both sides contend that petitioners are not liable for any interest on account of this 12-day period. We conclude that the "use of money" principle leads to the result that both sides contend is the correct result. The parties are to give effect to this conclusion in the computations under Rule 155.

We hold for respondent that interest on the 1979 underpayment begins to accrue on January 1, 1982, but does not accrue for the period June 16-28, 1982.

2. 1982

Petitioners' refund for 1982 was not attributable to a carryback. Accordingly, the date of petitioners' overpayment for 1982 is the first date when the amount of petitioners' payments in respect of 1982 exceeds the amount of their liabilities for 1982. Sec. 301.6611-1(b), Proced. & Admin. Regs.[24] Petitioners'

---

[24] Sec. 301.6611-1, Proced. & Admin. Regs., provides, in pertinent part, as follows:

SEC. 301.6611-1. Interest on overpayments.--

\* \* \* \* \* \* \*
(continued...)

tax payments and credits are deemed made on the last day for filing the return, April 15, 1983. Secs. 6513(a) and (b), and 6151. Thus, April 15, 1983, was the deemed date of petitioners' overpayment.

Under section 6611(b)(2), interest on an overpayment accrues from the date of the overpayment. Consistent with section 6611(b)(2), respondent accrued interest from April 15, 1983, the date of petitioners' claimed 1982 overpayment.

As a result of the foregoing, we conclude that petitioners are deemed to have had the use of their 1982 refund beginning April 15, 1983. The 1982 refund amounted to $14,851.79, consisting of $14,549 plus $302.79 interest. The parties settled their deficiency proceedings in this Court by agreeing to a deficiency of $4,298.

As we have noted, section 6601(a) provides the general rule that interest on an underpayment accrues from the last date prescribed for payment, which in the instant case was April 15, 1983. Petitioners raise the same use-of-the-money contention

---

[24](...continued)
    (b) Date of overpayment. Except as provided in section 6401(a), relating to assessment and collection after the expiration of the applicable period of limitation, there can be no overpayment of tax until the entire tax liability has been satisfied. Therefore, the dates of overpayment of any tax are the date of payment of the first amount which (when added to previous payments) is in excess of the tax liability (including any interest, addition to tax, or additional amount) and the dates of payment of all amounts subsequently paid with respect to such liability. * * *

that they raise with respect to 1979.  For the reasons stated

above with respect to 1979, we reject their contention.

Accordingly, we conclude that the start date for interest on the

1982 underpayment is April 15, 1983.

Petitioners also contend as follows:

Respondent seeks to recover two distinct obligations from
Petitioners.  The first obligation is a deficiency in tax,
recoverable under IRC §6213 (along with interest mandated by
IRC §6601).  The second obligation is "refunded interest"
erroneously paid to Petitioners, recoverable under IRC §7405
(with interest mandated only by IRC §6602).

Petitioners further contend that respondent's contentions as to

the start date for 1979 and 1982 mask an impermissible attempt to

recover erroneously refunded interest because the period of

limitations for filing a suit under section 7405 has expired.

See sec. 6532(b).

We disagree.

Respondent chose to proceed against petitioners under the

deficiency procedures.  As our analysis shows, the interest

provisions applicable to these procedures lead to the interest

starting dates contended for by respondent.  We have no occasion

to determine in the instant case whether respondent could

properly proceed against petitioners under section 7405 and, if

so, then what would be the effect of the section 6532(b)

limitations provisions.  In fact, respondent did not proceed

under section 7405 and cannot be compelled to do so.  The choice

is respondent's, not petitioners'.  E.g., Beer v. Commissioner,

733 F.2d 435, 436 (6th Cir. 1984) and cases there cited, affg. T.C. Memo. 1982-735; Pesch v. Commissioner, 78 T.C. 100, 117-118, 120 n.29 (1982); see also Ideal Rlty. Co. v. United States, 561 F.2d 1123, 1125 (4th Cir. 1977).

We hold for respondent that interest on the 1982 underpayment begins to accrue on April 15, 1983. See our comments, supra, as to the period for which respondent did not pay interest on the overpayment.

B. Asserted Accounting Errors

1. $2.44

Petitioners contend on opening brief that "$2.44 was paid 5/19/85 not 5/19/86". Respondent acknowledges on answering brief that, on an interest computation as to 1979 prepared for trial, the "$2.44 was listed in error on exhibit 82-R as May 19, 1996 instead of May 19, 1986." Respondent insists that "such item was paid on May 19, 1986. (Ex. 3-J)."

This dispute affects the "bottom line" only to the extent of 1 year's worth of interest on $2.44, plus the effect of compounding the interest on that 1 year's worth of interest. See, e.g., Dang v. Commissioner, 259 F.3d at 206.

The only evidence on this matter that we have found in the record is respondent's transcript of account, which shows the $2.44 as "credit applied 05-19-86 from Form 1040 tax period Dec 1985". In the absence of (1) any restrictions on the use of this

stipulated exhibit and (2) any evidence contradicting the correctness of this transcript of account entry, we conclude that it is more likely than not that the correct date is May 19, 1986, rather than May 19, 1985.

We hold for respondent on this issue.

2. $894.09 or $887.33

Petitioners contend on opening brief that "$894.09 (rather than 887.33) was paid on 12/26/86." Respondent acknowledges on answering brief that, on an interest computation as to 1979 prepared for trial, "the amount of a credit for a payment on December 26, 1985, was listed incorrectly on exhibit 83-R as $887.33 instead of $894.09."

This agreement between the parties, which is consistent with the information in respondent's transcript of account for 1979, is to be given effect in the computation under Rule 155.

C. Sec. 6621(c) Rate

On April 29, 1985, respondent assessed an additional $1,360 tax liability on account of 1979 and an additional $87 tax liability on account of 1981. Apparently, interest was accrued on these items at the section 6621(c) rate. The parties have stipulated that these assessed additional tax liabilities are not subject to the section 6621(c) rate.

On August 18, 1995, respondent assessed an additional $1,144 tax liability on account of 1981. Apparently, interest was

accrued on this item at the section 6621(c) rate. On opening brief, petitioners contend that the section 6621(c) rate should apply to only $1,137 of this item. On answering brief, respondent concedes that the section 6621(c) rate should apply to only $1,137 of the $1,144 additional assessment.

These agreements are to be given effect in the computation under Rule 155. As to any other questions regarding the section 6621(c) rate, we note that the parties' settlement in petitioners' deficiency case includes the determination that:

> the entire underpayment in income tax for the taxable years 1978, 1979, 1981 and 1982 is a substantial underpayment attributable to tax-motivated transactions for purposes of computing the interest payable with respect to such amount pursuant to I.R.C. § 6621(c), formerly I.R.C. § 6621(d);

This agreement by the parties in petitioners' deficiency case was part of the decision we entered disposing of that case.

Apart from the above-noted stipulation and the above-noted concession, we hold for respondent on this issue.

### III.  The $40,000 Offer in Compromise

In May 1996 (supra note 8) petitioners sent to respondent a check in the amount of $40,000 as part of an offer in compromise to settle their interest liability for 1978, 1979, 1981, and 1982. At Fish's request, on September 4, 1996, petitioners withdrew their offer in compromise. At some point, probably in December 1996, possibly in January 1997, respondent refunded to petitioners the $40,000, without interest.

Petitioners contend that the $40,000 they submitted along with their offer in compromise adequately compensated respondent for any interest that would have accrued during the period of time respondent held the $40,000, and thus interest on petitioners' interest liabilities should have been tolled during that period. Alternatively, petitioners claim that interest should be tolled from September 4, 1996, the date petitioners withdrew their offer, until an unspecified date in early January 1997, presumably the date petitioners received from respondent their $40,000. Respondent contends that petitioners are not entitled to an "interest credit", for lack of a better term, for the time that respondent held the $40,000 because the Form 656 petitioners executed, the form with which petitioners submitted the $40,000, provides that respondent is not obligated to pay interest on the $40,000 petitioners submitted.

We agree with respondent's conclusion.

Paragraph 7(c) of the Form 656 petitioners executed provides, in pertinent part, as follows: "I/we understand that IRS will not pay interest on any amount I/we submit with the offer." Section 301.7122-1(d)(4), Proced. & Admin. Regs., dictates the same result.[25] Thus, it is clear that petitioners

---

[25] Sec. 301.7122-1(d)(4), Proced. & Admin. Regs., provides, in pertinent part, as follows:

If an offer in compromise is withdrawn or rejected, the
(continued...)

are not entitled to interest on the $40,000 submitted with their offer in compromise. We still must decide, however, whether respondent erred in the computation of petitioners' interest liability by failing to toll the accrual of interest for the period in which respondent held the $40,000.

In contending that interest should not accrue during the period in which respondent held the $40,000, petitioners do not cite to any specific authority. Rather, they rely on the general "use of money" principle described in Avon Products, Inc. v. United States, 588 F.2d 342 (2d Cir. 1978), and developed by its progeny.

On the record in the instant case, we conclude that we cannot hold that respondent abused discretion and we cannot hold that there was a computational error with regard to the period

---

[25](...continued)
amount tendered with the offer, including all installments paid, shall be refunded without interest, unless the taxpayer has stated or agreed that the amount tendered may be applied to the liability with respect to which the offer was submitted.

This regulation, in effect for the period in which petitioners submitted their offer in compromise, was removed and replaced by sec. 301.7122-1T, effective July 21, 1999. 64 Fed. Reg. 39026 (July 21, 1999). The temporary regulation, "with minor changes", became final on July 18, 2002. 67 Fed. Reg. 48025 (July 23, 2002). The new regulation provides additional guidance regarding offers in compromise. T.D. 8829, 1999-2 C.B. at 235. It does not change the nature of amounts submitted with an offer in compromise; rather, it makes explicit that those amounts are considered deposits. Sec. 301.7122-1(h) of the new regulation.

during which respondent held the $40,000 that accompanied petitioners' offer in compromise.

Firstly, petitioners paid the $40,000 in connection with an offer in compromise to settle the dispute as to their interest liabilities for 1978, 1979, 1981, and 1982. About $65,000 of the then-disputed interest, more than half the total, was interest for 1978, a year as to which we do not have jurisdiction to grant relief. Indeed, petitioners' $40,000 offer was less than two-thirds of the 1978 interest alone. Neither side has suggested any way to apportion or allocate the $40,000 offer between 1978 on the one hand and 1979, 1981, and 1982 on the other hand. Petitioners did not make any such allocation in their offer in compromise. An allocation first to the interest on the oldest year's liability would not leave anything for any of the years as to which we could grant relief.

Secondly, respondent abated interest on the entire liabilities for the period October 4, 1995, through September 20, 1996. Supra table 5 and associated text. Respondent held petitioners' $40,000 from May 1996 until about the end of that year. Thus, there already is an abatement of interest on the whole debt for somewhat more than half of the period during which respondent held petitioners' $40,000.

Thirdly, it is not at all clear as to how the "use of money" principle should apply to the $40,000 paid with the offer in compromise.

A. Avon Products involved payments of tax. The instant case, however, involves a deposit. See Keith v. Commissioner, 35 T.C. 1130, 1136 (1961). Unlike payments, deposits are set aside "in special suspense accounts established for depositing money received when no assessment is then outstanding against the taxpayer." Rosenman v. United States, 323 U.S. 658, 662 (1945). "The receipt by the Government of moneys under such an arrangement carries no more significance than would the giving of a surety bond." Id. Deposits can be returned to the taxpayer upon request at anytime before respondent is entitled to assess the tax. See Rev. Proc. 84-58, 1984-2 C.B. 501. Because of this, respondent does not have unrestricted use of the money, as respondent does with payments.

B. Neither respondent nor petitioners have any obligation to pay interest during the period in which respondent holds a deposit. See Rosenman v. United States, 323 U.S. at 663-664; Rev. Proc. 84-58, 1984-2 C.B. 501. The purpose of interest, however, is "to compensate the Government for delay in payment of a tax," or to compensate the taxpayer for the use of the taxpayer's money. Avon Products, Inc. v. United States, 588 F.2d at 343. Thus, the absence of an obligation to pay interest is

yet another indication that deposits do not fit neatly into the "use of money" gloss on sections 6601 and 6611.

C. The parties have not discussed Rev. Proc. 84-58, 1984-2 C.B. 501, 503, which provides in pertinent part as follows:

Sec. 5. INTEREST

.01 * * *  If the remittance is held as a deposit in the nature of a cash bond, but is returned at the taxpayer's request, and a deficiency is later assessed for that period and type of tax, the taxpayer will not receive credit for the period in which the funds were held as a deposit. * * *

Petitioners withdrew the offer in compromise and eventually received back their $40,000.  Under these circumstances, we do not have to deal with any possible implications of the last sentence of section 5.01 of Rev. Proc. 84-58.  Nor do we have to consider whether the fact that petitioners were pro se at the time they withdrew the offer in compromise and that the withdrawal was at respondent's agent's suggestion has any impact on the application of that last sentence.  See generally Perkins v. Commissioner, 92 T.C. 749, 760 (1989).

On this record we conclude that we shall not direct respondent to abate interest or recompute interest to take account of the $40,000 that petitioners paid in connection with their offer in compromise.

We hold for respondent on this issue.

To take account of respondent's concessions and the foregoing,

Decision will be entered

under Rule 155.[26]

---

[26] The parties have stipulated as follows:

The parties agree that the methodology to use in determining the correct amount of interest for each year in issue is first to calculate the interest that accrues on the balance due (giving effect to all payments, credits, and abatements shown on the transcripts - exhibit 3-J) from the appropriate start date determined by the Court to the date interest was paid for that year with no interest accruing during the waiver periods, agreed abatement periods, such further abatement periods as determined by the Court, and such other periods of no interest accrual determined by the Court at issue in the case. This accrued interest is then subtracted from the total interest assessed. If the difference is a positive number, the difference is an overassessment of interest which should be abated. Since the total interest assessed has been paid, such overassessment will constitute an overpayment which should be refunded to petitioners.

This stipulation is to be given effect in the Rule 155 computations.